**FILMS OF DISTINCTION, INC. d/b/a The Crime Channel, Plaintiff,**

v.

**ALLEGRO FILM PRODUCTIONS, INC., et al., Defendants.**

**No. CV 98–0609 RAP(RZX).**

United States District Court, C.D. California.

June 1, 1998.

Leonard S. Machtinger, Thomas S. Rubin, Kenoff & Machtinger, Los Angeles, CA, for Plaintiff.

Donald R. Gordon, Robert S. Gutierrez, Leopold, Petrich & Smith, Los Angeles, CA, Fred A. Fenster, Heenan Blaikie, Beverly Hills, CA, for Defendants.

**ORDER GRANTING IN PART AND, DENYING IN PART DEFENDANTS MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(b)(6)**

PAEZ, District Judge.

## I.

### *Introduction*

Plaintiff Films of Distinction, Inc. d/b/a The Crime Channel ("Films of Distinction") brings this action for trademark infringement, defamation and product disparagement against defendants Allegro Film Productions ("Allegro"), Norstar Entertainment, Inc. ("Norstar"), Republic Entertainment, Inc. ("Republic"), Showtime Networks, Inc. ("Showtime") Westwind Productions Corporation ("Westwind Production"), and Westwind Releasing Corporation ("Westwind Releasing"). Plaintiff owns a television network entitled "The Crime Channel." Plaintiff alleges defendants used plaintiff's service mark "The Crime Channel" in their motion picture about a young boy who watches a cable television station called "The Crime Channel."

Pending before the Court is the motion of all defendants, with the exception of defendant Norstar, to dismiss plaintiff's claims for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6). Upon consideration of the parties' papers submitted in conjunction with the motion, and the oral arguments of counsel, the motion is **GRANTED IN PART AND DENIED IN PART** as set forth in detail below.

## II.

### *Factual Allegations*

Plaintiff owns a television network known as "The Crime Channel," which features programming devoted exclusively to the subject of crime. On June 21, 1994, plaintiff registered "The Crime Channel" service mark (the "Mark") on the Supplemental Register of the United States Patent and Trademark Office. Plaintiff contends that the Mark is inherently distinctive and has acquired secondary meaning in the minds of members of the public. Plaintiff alleges that it owns

exclusive rights in the "Crime Channel" mark.

According to the Complaint, defendants produced and distributed the motion picture "Relative Fear" (the "film"), which was shown on defendant Showtime's network. Plaintiff claims that the film concerns a young boy, Adam, who watches a television channel called the "Crime Channel." The film allegedly describes the channel as "America's first and only cable channel devoted exclusively to crime." According to plaintiff, after Adam watches the Crime Channel, he apparently commits several murders.

Plaintiff alleges that the Crime Channel in the film is repeatedly identified using plaintiff's service mark and that Adam watches the channel at least five times during the film. According to plaintiff

> Adam's mother repeatedly turns off the Crime Channel and says to Adam, among other things: "You shouldn't watch this." Adam's mother also tells him: "I blocked that channel. What is wrong with you? I've told you time and again not to watch these shows." An older woman taking care of Adam notices he is watching the Crime Channel and says: "Not while I'm here you don't."—and turns off the television. Near the end of the Film, Adam picks up a gun and shoots his father. At the very end of the Film, Adam points a stick like a gun at another child and says "Bang, you're dead."

Complaint, ¶ 19. Plaintiff also asserts that the Film's credits include a credit for the Crime Channel and individual credits for the Crime Channel's Director, Camera and Editing, and Coordinator.

Plaintiff contends that it never authorized defendants to use its Mark and that defendants had actual prior knowledge of plaintiff's prior use of the Mark. Plaintiff alleges that defendants' deliberate imitation of the "Crime Channel" mark caused plaintiff irreparable injury.

Plaintiff asserts claims of infringement of federally registered service mark under 15 U.S.C. § 1114; false designation of origin and false description under 15 U.S.C. § 1125; dilution of mark under 15 U.S.C. § 1125; common law trademark, service mark and trade name infringement and unfair competition; infringement of mark under California law (Bus. & Prof.Code § 14335); dilution of mark and injury to business reputation (Bus. & Prof.Code § 14330); unfair competition (Bus. & Prof.Code § 17200 et seq.); defamation; trade libel; intentional interference with prospective economic advantage; and unjust enrichment. Plaintiff seeks declaratory, injunctive, and monetary relief.

### III.

### *Discussion*

#### A. *Standard*

■ A motion to dismiss under Fed. R.Civ.P. 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. Accordingly, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint. *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994). The court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989); *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir.1988). "[A] document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994).

■ Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988). The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Development Corp.,* 108 F.3d 246, 249 (9th Cir.1997). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Barron v. Reich,* 13 F.3d 1370, 1374 (9th Cir.1994). The court is not required,

however, to accept "conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg*, 18 F.3d at 754–55.

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). The notice pleading standard set forth in Rule 8 establishes "a powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan*, 108 F.3d at 248 (citations omitted). Consequently, a court may not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by the inclusion of additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir.1995).

### B. *Application*

#### 1. Service Mark Infringement

Trademarks and service marks[1] are protected under the Lanham Act, and under the common law, to protect business goodwill and to enable consumers to distinguish among competing producers. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). "The purpose of a trademark is to designate the source of a product." *Technical Publishing Co. v. Lebhar–Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir.1984). Consequently, the basic test for trademark infringement under both federal and common law is whether the use of the mark is likely to cause confusion as to the source of the goods or services. *Dr. Seuss Enterprises,*

*L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir.1997).

Trademark law balances the public interest in identifying the source of goods and preventing free-riders from appropriating their competitor's reputations against the public interest in preventing depletion of the words, phrases and symbols available to communicate in the marketplace. *Cf., New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 305–306 (9th Cir.1992). To maintain this balance, certain terms are excluded from trademark protection and certain uses are permitted despite the validity of a trade or service mark. Defendants move to dismiss plaintiff's First, Second, Fourth, and Fifth claims for service mark infringement under the Lanham Act and under California law, arguing that (1) the "Crime Channel" mark is generic; (2) defendants' use of the Mark is protected by the fair use doctrine; and (3) defendants' use is protected by the First Amendment. Plaintiff appears to concede that all four claims rise and fall together with respect to these defenses.

#### a. Genericness

"A generic term is one that refers to the genus of which the particular product is a species." *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 821 (9th Cir.1996) (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)). A generic term can never be protected as a trademark because it neither identifies the user's goods nor distinguishes them from another's goods. McCarthy, § 12:57 at 12–109 (citing 15 U.S.C. § 1127). Allowing one party to monopolize a generic term would prevent competitors from adequately describing their own goods or services. By contrast, a "merely descriptive" mark may be protected "if the registrant shows that it has acquired secondary meaning, i.e., it 'has become distinctive of the applicant's goods in com-

---

1. A service mark is a word, symbol or device used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127. The same substantive rules of validity and infringement apply to service marks and trademarks. McCarthy, J. Thomas, *McCarthy on Trademarks and Unfair Competition*, § 4:14 at 4–16 (4th ed.1996) (hereinafter McCarthy, § ___ at ___).

merce.'" *Park 'N Fly*, 469 U.S. at 194, 105 S.Ct. 658 (quoting 15 U.S.C. 1052(e), (f)).

 Whether an alleged mark is a generic term is a question of fact. *Committee for Idaho's High Desert, Inc.*, 92 F.3d at 821; *Official Airline Guides, Inc. v. Goss*, 856 F.2d 85, 87 (9th Cir.1988).[2] Whether a term is generic depends upon the primary significance of the mark to the relevant public. *Id.* (citing 15 U.S.C. 1064(3)).

 Likewise, whether a descriptive mark has acquired secondary meaning requires a factual determination. "Factors considered in determining whether a secondary meaning has been achieved include: (1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether the use of the claimed trademark has been exclusive." *Id.* at 822 (internal brackets and citations omitted).

 Here, plaintiff alleges that the "Crime Channel" is inherently distinctive and has gained secondary meaning in the minds of members of the public. Complaint, ¶ 16. Taking the allegations of the complaint as true, as we must on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), plaintiff has sufficiently alleged that the "Crime Channel" mark is not generic, i.e., its primary significance to the relevant public is to identify plaintiff as the source, and is entitled to protection under the Lanham Act and California's common law equivalent. *Compare, CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11 (2d Cir.1975) (reversing denial of motion to dismiss because title of trade magazine, "Consumer Electronics," was generic).

Defendants point out that plaintiff's Mark is only registered on the Supplemental Register. At this juncture, that fact is of little concern. The Court notes, however, that "where a term is clearly a generic name for goods, Supplemental Registration is not available, for a generic name is not capable of trademark significance." McCarthy, § 19:38

at 19–79. On the other hand, where the generic status or descriptiveness of a term is questionable at the time of registration, doubts are resolved in favor of the applicant. McCarthy, § 12:57 at 12–110. Nonetheless,

[a] word, symbol or device on the Supplemental Register is not, strictly speaking, a "mark." That is, it is not registrable on the Principal Register and is only "capable" of someday becoming a "mark" upon the acquisition of secondary meaning.

McCarthy, § 19:37 at 19–76. While "the better view is that application for the Supplemental Register is an admission against interest that the term is not inherently distinctive and does not yet have secondary meaning[,] . . . [it] does not estop the applicant from proving otherwise in court." McCarthy, § 19:43 at 19–83.

In sum, plaintiff's allegations are sufficient to defeat the motion to dismiss on grounds that the "Crime Channel" is a generic term.

### b. Fair Use

 The Lanham Act provides a defense to trademark infringement where the defendant uses the term "otherwise than as a mark" and "fairly and in good faith only to describe the goods or services of [the defendant.]" 15 U.S.C. § 1115(b)(4). The so-called "fair use" defense to trademark infringement precludes a trademark registrant from appropriating a descriptive term and thereby "prevent[ing] others from accurately describing a characteristic of their goods." *New Kids*, 971 F.2d at 306. "In technical trademark jargon, the use of words for descriptive purposes is called a 'fair use,' and the law usually permits it even if the words themselves also constitute a trademark." *Id.* at 307 (quoting *WCVB–TV v. Boston Athletic Ass'n*, 926 F.2d 42, 46 (1st Cir.1991)).

The holder of a protectable descriptive mark has no legal claim to an exclusive right in the primary, descriptive meaning of the term; consequently, anyone is free to use the term in its primary, descriptive sense so long as such use does not lead to

**2.** *But see New Kids*, 971 F.2d at 306 ("When a trademark comes to describe a class of goods rather than an individual product, the courts will

hold as a matter of law that use of the mark does not imply sponsorship or endorsement of the product by the original holder.").

customer confusion as to the source of the goods or services.

*Transgo, Inc. v. Ajac Transmission Parts Corp.*, 911 F.2d 363, 366 n. 2 (9th Cir.1990). In other words, the fair use defense applies "where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one." *New Kids*, 971 F.2d at 308. In the classical fair use case, a defendant uses plaintiff's descriptive mark to describe the defendant's product, and defendant contends its use is a descriptive rather than a trademark use. *Id.*

▇▇▇▇ The Ninth Circuit also recognizes a variant of the fair use doctrine, denominated "nominative fair use." *Id.; compare National Federation of the Blind v. Loompanics Enterprises, Inc.*, 936 F.Supp. 1232, 1241 (D.Md.1996) (comparing *New Kids* test to principle that use of registered mark to truthfully refer to the holder of the mark is permissible).

> Such nominative use of a mark—where the only word reasonably available to describe a particular thing is pressed into service—lies outside the strictures of trademark law: Because it does not implicate the source-identification function that is the purpose of trademark, it does not constitute unfair competition; such use is fair because it does not imply sponsorship or endorsement by the trademark holder.

*Id.* To establish nominative fair use where a defendant uses a mark to describe the plaintiff's product or service: (1) the product or service must be one not readily identifiable without use of the trademark; (2) only that portion of the mark reasonably necessary to identify the product or service may be used; and (3) the user must take no action, beyond use of the mark, that would suggest sponsorship or endorsement by the trademark holder. *Id.* The fact that an allegedly infringing use is undertaken for profit and in competition for the registrant's business is immaterial. *Id.* at 309.

▇▇▇ Here, plaintiff contends that defendants' use of the "Crime Channel" in the Film is confusingly similar to the alleged Mark, and that confusion will create the erroneous impression that the "Crime Channel" in the Film "has been created, approved, sponsored, endorsed, or is in some way affili-

ated with, Plaintiff." Complaint, ¶¶ 24, 31. According to plaintiff, defendants had actual prior knowledge of the Channel, plaintiff's ownership of the Channel and plaintiff's prior use of the term the "Crime Channel." Complaint, ¶ 23.

By alleging that the "Crime Channel" is a valid service mark, plaintiff alleges that the term is not generic. As the *New Kids* court explained in describing the fair use defense, "sometimes there is no descriptive substitute, and a problem closely related to genericity and descriptiveness is presented when many goods and services are effectively identifiable only by their trademarks." *Id.* at 306. Both the traditional and nominative fair use defenses may be defeated by a showing that the mark is used as a mark, i.e. for its source-identification function, rather than because no sufficiently descriptive substitute exists.

Plaintiff's allegation that defendants' use intentionally creates a likelihood of confusion with respect to whether the Film refers to plaintiff's product or to a fictional television channel devoted to crime precludes resolution on a motion to dismiss for two reasons. First, if defendants intentionally used plaintiff's mark to create confusion, the good faith requirement for fair use is not satisfied, i.e., defendants have done something that, in conjunction with the mark, suggests sponsorship or endorsement by the trademark holder. *See New Kids*, 971 F.2d at 308.

Second, plaintiff's allegations establish, for purposes of a motion to dismiss, that defendants did not use the Mark "otherwise than as a mark." Rather, defendants used the Mark to identify plaintiff as the source or create confusion as to the source of the fictional channel in the Film. The traditional fair use defense applies only where the defendants' use "does not lead to customer confusion as to the source of the goods or services." *Transgo, Inc.*, 911 F.2d at 366 n. 2.

The same rationale ultimately applies to the nominative fair use exception. Thus far, the Ninth Circuit has only permitted nominative fair use where defendant refers to plaintiff's product. Here, plaintiff's allegations indicate that defendants referred to a fictional channel confusingly similar to plain-

tiff's Crime Channel. Nonetheless, assuming the exception applies in these circumstances, plaintiff's allegation that defendants used the mark for its source-identification function precludes dismissal. Just as genericness cannot be determined on a motion to dismiss absent an allegation that the primary significance of the term is descriptive, the applicability of the nominative fair use exception cannot be determined on a motion to dismiss absent allegations establishing that the product or service is readily identifiable without use of the trademark. In other words, the conclusion that a service is not "readily identifiable" without use of the mark is virtually equivalent to a determination that the mark is generic. Assuming defendants' use of the term "Crime Channel" referred to plaintiff's service, the Court cannot conclude, based on plaintiff's allegations, that the "Crime Channel" is readily identifiable without use of the mark. Accordingly, defendants' motion to dismiss plaintiff's trademark claims under the fair use exception is properly denied.

Although plaintiff's allegations of customer confusion as to the source of the fictional channel are sufficient to survive a motion to dismiss, the Court notes that "[w]here the use of the mark is in an unflattering context or a setting which would be disadvantageous to the mark's holder, it would seem customer confusion as to endorsement or affiliation is particularly unlikely." *National Federation of the Blind*, 936 F.Supp. at 1242. Whether consumer confusion exists as a result of defendants' use, however, is a question for summary judgment.

### c. First Amendment Limitations on Trademark

■ Defendant also moves to dismiss plaintiff's trademark infringement claims on First Amendment grounds. Defendant relies on the Second Circuit's test protecting literary titles:

> Because of an author's significant First Amendment interest in choosing an appropriate title for his or her work, we have held that literary titles do not violate the Lanham Act "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source of the content of the work."

*Twin Peaks Productions v. Publications Intern.*, 996 F.2d 1366, 1379 (2d Cir.1993) (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir.1989)). Under the *Rogers* test, "the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest [in protection of artistic titles.]" *Id.*

Judge Real of this District has previously explained that "cases of parody or competing artistic titles should not be singled out for preferential treatment where the interests underlying the Lanham Act and the First Amendment are in conflict. Neither the language in the relevant case law nor public policy supports such a distinction." *No Fear, Inc. v. Imagine Films, Inc.*, 930 F.Supp. 1381, 1383 (C.D.Cal.1995). Rejecting the "explicitly misleading" standard set forth in *Rogers*, Judge Real applied the Second Circuit's more recent articulation of the test in *Twin Peaks*. Under *Twin Peaks*, the court must first determine whether there is a likelihood of confusion, applying the traditional trademark law factors. *Id.* at 1384. *Twin Peaks* court held, however, that the plaintiff's showing of likelihood of confusion must be "particularly compelling" to overcome First Amendment concerns. *Id.* (following *Twin Peaks*).

Neither party addresses the most recent controlling case law on this issue. In *Dr. Seuss*, the Ninth Circuit affirmed a preliminary injunction protecting plaintiff's trademark in the face of a First Amendment challenge where plaintiff had shown serious questions going to the merits concerning whether a likelihood of confusion existed between Dr. Seuss' children's book, *The Cat in the Hat*, and defendants' satirical book about the O.J. Simpson murder trial, *The Cat NOT in the Hat. Id.*, 109 F.3d at 1403 n. 11, 1405; *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir.1992) (upholding injunction prohibiting use of trademark against First Amendment challenge because "misleading commercial speech can be restricted."). Implicitly rejecting the *Rogers* balancing test, the *Dr. Seuss* court harkened back to an earlier Second Circuit holding that "[t]rademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expres-

sion." *Id.* (citing *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979) (holding First Amendment satisfied where alternative avenues to communication allow infringer to convey message)).

The *Dr. Seuss* court "rejected outright" defendants' argument that the injunction constituted a prior restraint, holding that "[t]he issue in trademark infringement actions is not the alleged appropriation of [ ] creative expression, but rather, the likelihood of confusion in the market place[.]" *Id.* at 1403.[3] In so holding, the Ninth Circuit affirmed the District Court's conclusion, explicitly rejecting the *Rogers* test, that "[w]here alternative means of achieving the satiric or parodic ends exist that would not entail consumer confusion, the First Amendment will not protect the parodist from being held to infringe. The Court's reasoning as to the fair use defense therefore applies equally to this issue." *Dr. Seuss Enterprises v. Penguin Books USA, Inc.,* 924 F.Supp. 1559, 1573 (S.D.Cal.1996).

In short, it appears the Ninth Circuit will not adopt the Second Circuit *Rogers/Twin Peaks* test balancing trademark protections against the artistic interest in protecting literary titles. The Ninth Circuit's brief discussion of the issue in *Dr. Seuss* strongly suggests that this "balancing" has already been adequately accomplished by the statutory framework. Accordingly, defendants' motion to dismiss plaintiff's trademark claims based on a First Amendment "literary titles" defense is properly denied.[4]

3. Likewise, with respect to the defendants' argument that their use of Seuss' trademarks was protected as a parody, the Circuit concluded:

In a traditional trademark infringement suit founded on the likelihood of confusion rationale, the claim of parody is not really a separate "defense" as such, but merely a way of phrasing the traditional response that customers are not likely to be confused as to the source, sponsorship or approval.... [T]he claim of parody is no defense "where the purpose of the similarity is to capitalize on a famous mark's popularity for defendant's own commercial use."

*Id.* at 1405–06 (citations omitted).

4. Plaintiff argues that defendants are not using the "Crime Channel" as a title and cannot rely on *Rogers* as a defense. In light of the Court's disposition of the First Amendment challenge,

## 2. Trademark Dilution—Claims Three and Six

Defendants move to dismiss plaintiff's Third and Sixth claims for trademark dilution under the Federal Trademark Dilution Act, 15 U.S.C. § 1125, and the parallel California anti-dilution statute, California Business & Professions Code § 14330. "Trademark dilution laws protect 'distinctive' or 'famous' trademarks from certain unauthorized uses of the marks regardless of a showing of competition or likelihood of confusion." *Panavision Int'l L.P. v. Toeppen,* 945 F.Supp. 1296, 1301 (C.D.Cal.1996), *aff'd, Panavision Int'l L.P. v. Toeppen,* 141 F.3d 1316, 1324 (9th Cir.1998). Anti-dilution statutes therefore protect a trademark from damage resulting from non-competing uses of the mark. *Id.* A California state law dilution claim "is subject to same analysis as [a] federal claim." *Panavision Int'l L.P. v. Toeppen,* 141 F.3d 1316, 1326 (9th Cir.1998).

> In order to prove a violation of the Federal Trademark Dilution Act, a plaintiff must show that (1) the mark is famous; (2) the defendant is making a commercial use of the mark; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services.

*Id.*[5]

Here, plaintiff alleges that defendants use of the term "Crime Channel" di-

the Court need not determine at this juncture whether *Rogers* extends to the title of a fictional television channel within a film titled without reference to the alleged mark.

5. Dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127. Traditionally, dilution has been found where the defendant's conduct either tarnishes or blurs the mark, but dilution is not limited to tarnishment and blurring. *Panavision Int'l,* 141 F.3d at 1326. When a famous mark is linked to products of lesser quality or portrayed in an unwholesome manner, the mark is tarnished. *Panavision Int'l,* 945 F.Supp. at 1304 (citations

lutes the value of plaintiff's mark by suggesting that plaintiff's product causes violent behavior in children. Complaint, ¶ 34. Defendant contends plaintiff's mark is not famous, relying on the fact that the "Crime Channel" is only registered on the Supplemental Register. As the Court noted above, while "the better view is that application for the Supplemental Register is an admission against interest that the term is not inherently distinctive and does not yet have secondary meaning[,] ... [it] does not estop the applicant from proving otherwise in court." McCarthy, § 19:43 at 19–83.

The Federal Anti–Dilution Act, 15 U.S.C. § 1125, lists eight nonexclusive factors a court may consider in determining whether a mark is distinctive and famous. The statutory factors are: (1) "the degree of inherent or acquired distinctiveness of the mark;" (2) the duration and extent of plaintiff's use of the mark in connection with its goods or services; (3) "the duration and extent of advertising and publicity of the mark;" (4) "the geographical extent of the trading area in which the mark is used;" (5) "the channels of trade for the goods or services with which the mark is used;" (6) "the degree of recognition of the mark in the trading areas and channels of trade used by the mark['s] owner and the person against whom the injunction is sought;" (7) "the nature and extent of use of the same or similar marks by third parties;" and (8) "whether the mark was registered under the Act of March 3, 1881, of February 20, 1905, or on the principal register."

It should go without saying that where plaintiff has alleged that its mark is "inherently distinctive" and "has become known to the consuming public as identifying and distinguishing [p]laintiff exclusively and uniquely as the source of the services to which the Mark applies," Complaint, ¶¶ 16–17, distinctiveness and famousness cannot be determined as a matter of law. Defendants' motion to dismiss plaintiff's Third and Sixth claims for relief is denied.

### 3. California Business & Professions Code § 17200

Plaintiff's allegations are sufficient to state a claim under California Business & Professions Code § 17200. Section 17200 provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice[.]" Section 17200 is interpreted broadly and allows lawsuits based on the public's right to protection from fraud, deceit and other unlawful conduct, as well as actions aimed at anticompetitive business practices. *See Hewlett v. Squaw Valley Ski Corp.*, 54 Cal.App.4th 499, 519, 63 Cal.Rptr.2d 118 (1997) (citing *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 209–10, 197 Cal.Rptr. 783, 673 P.2d 660 (1983)). In the oft-quoted definition: "[a]n unlawful business activity includes anything that can properly be called a business practice and that at the same time is forbidden by law." *Id.* (citations and internal quotation marks omitted). "Whether any particular conduct is a business practice within the meaning of section 17200 is a question of fact dependant on the circumstances of each case." *People v. E.W.A.P., Inc.*, 106 Cal.App.3d 315, 322, 165 Cal.Rptr. 73 (1980) (holding allegations of commercial distribution of obscene material sufficient to state a claim under 17200 and refusing, at pleading stage, to resolve scope of appropriate injunctive relief). Here, plaintiff sufficiently alleges that defendants' intentional service mark infringement constitutes a business practice under § 17200. *See* Complaint, ¶ 67.[6] Defendants' motion to dismiss plaintiff's Seventh claim for relief is properly denied.

omitted). " 'Blurring' involves a 'whittling away' of the selling power and value of a trademark by unauthorized use of the mark. Examples of blurring would be "Pepsi" in-line skates or "Microsoft" lipstick." *Id.*

**6.** Furthermore, Cal. Bus. & Prof.Code § 17200, et seq. is not limited to instances of commercial advertising, despite the fact that interpretation of California's consumer protection statutes is guided by federal court interpretation of similar federal statutes, *see O'Connor v. Superior Court*, 177 Cal.App.3d 1013, 1017, 223 Cal.Rptr. 357 (1986), and that § 1125(a)(1)(B) of the Lanham Act requires misrepresentations to consist of commercial advertising or promotion to be actionable, *see, e.g., Oxycal Laboratories, Inc. v. Jeffers*, 909 F.Supp. 719 (S.D.Cal.1995). While such an argument may have persuasive value, unlike the Lanham Act, § 17200 does not contain the "commercial advertising or promotion" limitation on its face.

## 4. Defamation

 Defendants move to dismiss plaintiff's defamation claim on grounds that the publication in the Film is merely an expression of constitutionally protected opinion. Defendants base their motion to dismiss on *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) and its progeny. "Although defamation is primarily governed by state law, the First Amendment safeguards for freedom of speech and press limit state law." *Underwager v. Channel 9 Australia,* 69 F.3d 361, 366 (9th Cir.1995). Statements of opinion on matters of public concern that do not contain or imply a provable factual assertion are constitutionally protected. *Id.* (following *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695 (rejecting bright-line distinction between opinion and fact and holding statement of opinion that may imply "a false assertion of fact" is actionable)). The threshold question is "whether a reasonable factfinder could conclude that the contested statement implies an assertion of objective fact." *Partington v. Bugliosi,* 56 F.3d 1147, 1153 (9th Cir.1995) (internal brackets and marks omitted).

To determine whether a statement implies a factual assertion, we examine the totality of the circumstances in which it was made. First, we look at the statement in its broad context, which includes the general tenor of the work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Underwager,* 69 F.3d at 366 (following *Partington,* 56 F.3d at 1153, and *Unelko Corp. v. Rooney,* 912 F.2d 1049, 1053 (9th Cir.1990)).[7]

Here, plaintiff premises its defamation claim on the following allegations:

After the child in the Film, Adam, watches the Crime Channel, he apparently commits several murders and shoots his father. Adam's mother repeatedly turns off the Crime Channel and says to Adam, among other things: "You shouldn't watch this." Adam's mother also tells him: "I blocked that channel. What is wrong with you? I've told you time and again not to watch these shows." An older woman taking care of Adam notices he is watching the Crime Channel and says: "Not while I'm here you don't." and turns off the television. At the very end of the Film, Adam points a stick like a gun at another child and says "Bang, you're dead."

Complaint, ¶ 75 (the "Defamatory Material"). Plaintiff contends the Defamatory Material "was understood by those who saw it and heard (sic) to mean that watching Plaintiff's Channel causes children to become killers." *Id.,* ¶ 76.

---

7. Plaintiff incorrectly contends that this inquiry cannot be made on a motion to dismiss. Whether a statement is "reasonably susceptible of an interpretation which implies a provably false assertion of fact—the dispositive question in a defamation action—is a question of law for the court." *Couch v. San Juan Unified School Dist.,* 33 Cal.App.4th 1491, 1500, 39 Cal.Rptr.2d 848 (1995). To resolve that question, the court considers whether the reasonable or average reader would interpret the statement, taken in context, to imply a false assertion of fact. *Id.; Norse v. Henry Holt & Co.,* 991 F.2d 563, 566 (9th Cir. 1993) ("To discern whether a statement has a defamatory meaning, we interpret it from the standpoint of the average reader, [ ] judging the statement not in isolation, but within the context in which it is made.").

. On a motion to dismiss, "[the] court's inquiry is not to determine if the communication reasonably carries with it a defamatory meaning...

Just as the court must refrain from a 'hair-splitting' analysis of what is said in an article to find an innocent meaning, so must it refrain from scrutinizing what is not said to find 'a defamatory meaning which the article does not convey to a lay reader.'" *Church of Scientology of California v. Flynn,* 744 F.2d 694, 696 (9th Cir.1984) (quoting *Forsher v. Bugliosi,* 26 Cal.3d 792, 803, 163 Cal.Rptr. 628, 608 P.2d 716 (1980) (additional citations omitted)). Put simply, dismissal is improper if "by reasonable implication a defamatory meaning may be found in the communication." *Id.* at 696 (quoting *Forsher,* 26 Cal.3d at 806, 163 Cal.Rptr. 628, 608 P.2d 716). Nonetheless, it is appropriate to determine whether a statement is fairly susceptible of a defamatory meaning in response to a challenge to the pleadings. *Polygram Records, Inc. v. Superior Court,* 170 Cal.App.3d 543, 551, 216 Cal. Rptr. 252 (1985).

Applying the Ninth Circuit's three-step test, none of the alleged Defamatory Material implies a factual assertion. First, the Film as a whole is clearly a work of fiction. Consequently, the general tenor of the Film and the context in the which the alleged Defamatory Material arises "negate[ ] the impression that the defendant[s] w[ere] asserting an objective fact." *See Partington,* 56 F.3d at 1153. Second, the allegedly defamatory statements consist of various adults telling the child, Adam, not to watch the Crime Channel. Taken together, the incidents in the Film suggest that the adults find the Crime Channel abhorrent and think that watching the Crime Channel is bad for the child. The Film's use of rhetoric to convey this suggestion negates the impression that defendants were asserting an objective fact. Defendants did not publish an academic study indicating that watching plaintiff's channel increases the likelihood that a child will commit violent crimes. Any audience viewing the Film would understand that the statements did not represent provable assertions, particularly in light of the ongoing public debate over what causes children to commit violent crimes. *See Underwager,* 69 F.3d at 367 (audience to discussion of defense tactics in child abuse cases would expect emphatic language on both sides).

Turning to the last prong of the Ninth Circuit test, none of the allegedly defamatory statements are capable of being proved true or false. In *Underwager,* the Circuit explained that even if defendant had ·stated that plaintiff was "intrinsically evil, such as assertion is not capable of verification." *Id.* Likewise, here, even if defendants' Film conveys the general assertion that watching plaintiff's Crime Channel is bad for children and may cause them to become violent offenders, such an assertion would be difficult if not impossible to prove. *Cf. Partington,*

56 F.3d at 1157 ("[N]egative statements concerning a lawyer's performance during ·trial, even if made explicitly, are generally not actionable since they are not ordinarily 'susceptible of being proved true or false.'").

■■■ Considering the totality of the circumstances and taking into account the general tenor of the Film, the specific language that allegedly constitutes the Defamatory Material, and whether the statements at issue can be proved true or false, no reasonable factfinder could conclude that the statements imply an assertion of objective fact. Accordingly, defendants' publication of the alleged Defamatory Material is privileged under the First Amendment, and plaintiff's defamation claim is properly dismissed.[8]

### 5. Trade Libel

■■■ Under California law, "trade libel is an intentional disparagement of the *quality* of property, which results in pecuniary damage." Witkin, B., 5 *Summary of California Law,* Torts § 573 (9th ed. Bancroft–Whitney Co.1988); *Leonardini v. Shell Oil Co.,* 216 Cal.App.3d 547, 574, 264 Cal.Rptr. 883 (1989) (citing Witkin). Trade libel is more like unfair competition than true libel and is not actionable as defamation. *Microtec Research, Inc. v. Nationwide Mutual Ins. Co.,* 40 F.3d 968, 972 (9th Cir.1994). Although the defamatory torts of slander and libel are similar to what is known in California as "trade libel," the torts are distinct and must be treated individually. Thus, "an 'action for defamation is designed to protect the reputation of the plaintiff, and the judgment vindicates that reputation, whereas the action for disparagement is based on pecuniary damages and lies only where such damage has been suffered.'" *Leonardini v. Shell Oil Co.,* 216 Cal.App.3d 547, 573, 264 Cal.Rptr.

8. Plaintiff's defamation claim is also properly dismissed because that claim, like the trade libel claim discussed below, rests on the alleged falsity of the Film's overall message rather than its individual statements. In the Ninth Circuit, a product defamation or trade libel claim must be based on specific statements, and "[t]he defamatory character of the language must be apparent from the words themselves." *Auvil v. CBS "60 Minutes",* 67 F.3d 816, 822 (9th Cir.1995) (analyzing Restatement (Second) of Torts § 651(1)(c)

and rejecting attempt to base product disparagement claim on overall message of broadcast). The Ninth Circuit reasoned in *Auvil* that allowing a plaintiff to "derive a specific, implied message from the broadcast as a whole and to prove the falsity of that overall message ... [would] make it difficult for broadcasters to predict whether their work would subject them to tort liability .... rais[ing] the spectre of a chilling effect on speech." *Id.* That reasoning applies equally to trade libel and defamation claims.

883 (1989) (quoting 5 Witkin, *Summary of Cal.Law*, Torts, pp 661–62 (9th ed.1988)).

■ Under California law, "First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement." *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal.4th 553, 563, 71 Cal.Rptr.2d 731, 950 P.2d 1086 (1998) (quoting *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1045, 232 Cal.Rptr. 542, 728 P.2d 1177 (1986), and reaffirming rule preventing "creative pleading" from "rendering nugatory the First Amendment limitations placed on litigation against speech").

■ If the defendants' statements about the plaintiff's product or service are protected opinions, the cause of action for trade libel must fail. *Hofmann Co. v. E.I. Du Pont De Nemours & Co.*, 202 Cal.App.3d 390, 397, 248 Cal.Rptr. 384 (1988) (because gravamen of trade libel claim is allegation defendant made false statements that injured plaintiff's business, First Amendment limitations are applicable). For all the reasons set forth above with respect to defamation, defendants' alleged statements concerning plaintiff's Crime Channel are opinions protected under the First Amendment. Accordingly, plaintiff's trade libel claim is properly dismissed on this basis alone.

Defendants move to dismiss plaintiff's Ninth claim for relief for trade libel, contending plaintiff cannot seek to recover based on an "overall message" rather than specific statements. *See Auvil*, 67 F.3d at 822 (rejecting product disparagement claim based on Washington law because defamatory character was not apparent from individual statements as opposed to overall message). California, like Washington, has adopted the Restatement formulation of trade libel law. *Leonardini*, 216 Cal.App.3d at 572, 264 Cal.Rptr. 883. Plaintiff points to no principled distinction between California law and Washington law that would make the Ninth Circuit's analysis in *Auvil* inapplicable to California law. Plaintiff does not allege or contend that the individual statements at issue constitute trade libel. Accordingly, plaintiff's trade libel claim is properly dismissed on the independent ground that it improperly relies on the overall message of the Film.

Defendant's motion to dismiss plaintiff's trade libel claims is granted.

### 6. Intentional Interference with Prospective Economic Advantage

■ To state a claim for intentional interference with prospective economic advantage, a plaintiff must plead: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *LiMandri v. Judkins*, 52 Cal.App.4th 326, 339, 60 Cal.Rptr.2d 539 (1997). "[A] plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.'" *Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal.4th 376, 393, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995).

■ Here, plaintiff alleges intentional interference based on (1) unauthorized use of the Mark; and (2) broadcasting and distributing the Defamatory Material. Complaint, ¶ 95. Because First Amendment limitations are applicable to all claims where the gravamen of the claim is the alleged injurious falsehood of a statement, *Stop Youth Addiction*, 17 Cal.4th at 563, 71 Cal.Rptr.2d 731, 950 P.2d 1086, and because the First Amendment protects defendants' alleged injurious falsehoods as statements that can not be reasonably construed as implying objective facts, plaintiff's claim for intentional interference with prospective advantage is properly dismissed to the extent that claim is based on the alleged falsehood of the statements. To the extent plaintiff's claim is premised on violations of trademark law, however, plaintiff adequately states a claim for relief.

### 7. Negligent Interference with Prospective Economic Advantage

Both parties concede that plaintiff's intentional interference and negligent interference claims rise and fall together. Accordingly, plaintiff's Eleventh claim for negligent interference is dismissed to the extent it relies on alleged injurious falsehoods. The motion to dismiss is denied to the extent the Eleventh claim is premised on violations of trademark law.

### 8. Unjust Enrichment

Defendants' only basis for seeking dismissal of this claim is their contention that it must rise or fall with plaintiff's trademark claims. Because the motion to dismiss plaintiff's trademark claims is denied, the motion to dismiss the Twelfth claim for unjust enrichment is also denied.

### 9. Declaratory Relief

Under the Declaratory Judgment Act, 28 U.S.C. § 2201, federal district courts "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Plaintiff's claim for declaratory relief seeks a declaration of rights and other legal relations. Defendants' only basis for seeking dismissal is their presumption that the remaining twelve claims for relief are baseless. Because the Court concludes otherwise, the motion to dismiss the Thirteenth claim is also denied.

## IV.

### Conclusion

For the foregoing reasons, defendant's motion is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**